# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

NEW MEXICO DEPARTMENT OF
GAME AND FISH,

               Petitioner,

v.                                                 No. CV 16-00462 WJ/KBM

UNITED STATES DEPARTMENT OF
THE INTERIOR, _et al._,

               Respondents.

## MEMORANDUM OPINION AND ORDER GRANTING PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION AND ORDER FOR PROPOSED ORDER OF INJUNCTION

THIS MATTER comes before the Court upon Petitioner New Mexico Department of Game and Fish's Motion for Preliminary Injunction and Temporary Restraining Order (**Doc. 3**), filed May 20, 2016. Having reviewed and considered the parties' written and oral arguments and the applicable law, the Court finds that Petitioner's Motion for Preliminary Injunction is well-taken, and therefore **GRANTED**, as herein described.

### BACKGROUND

Petitioner New Mexico Department of Game and Fish ("Petitioner" or "Department") alleges that beginning in 1998, Respondent United States Fish and Wildlife Service ("Service") and the collective Respondents ("Respondents") began to introduce the Mexican gray wolf into Arizona and New Mexico. Over the intervening period, the Service has introduced dozens of wolves in Arizona and New Mexico. Petitioner alleges that until now, Respondents obtained approval from the Department prior to every importation and release of a wolf within New

Mexico borders. On April 1, 2015 and May 6, 2015, the Service filed two separate applications with the Department to release wolves in New Mexico. The Director of the Department denied both applications on June 2, 2015 on the grounds that the Service did not submit a federal species management plan along with the application. On June 22, 2015, the Service appealed the Director's decision to the New Mexico Game Commission, and the New Mexico Game Commission upheld the Director's decision on September 29, 2015. On October 14, 2015, the Service, by letter to the Department, indicated that it no longer intended to comply with New Mexico's permitting requirements and would move forward with the reintroduction of Mexican wolves in New Mexico. The Department sent a 60-day notice of intent to sue letter to the Service on April 20, 2016. Petitioner alleges that around April 23, 2016, Respondents released two wolves in New Mexico without obtaining Department approval. Petitioner further alleges that Respondents are poised to soon release additional wolves within New Mexico.

New Mexico law prohibits the importation and release of non-domesticated animals, including Mexican wolves, without a permit from the Department. *See* NMAC §§ 19.35.7.8, 19.35.7.19, 19.31.10.11. Petitioner also alleges that federal law requires Respondents "carrying out research programs involving the taking or possession of fish and wildlife or programs involving reintroduction of fish and wildlife" to "consult with the States and comply with State permit requirements . . . except in instances where the Secretary of the Interior determines that such compliance would prevent him from carrying out his statutory responsibility." 43 C.F.R. § 24.4(i)(5)(i).

Petitioner filed a Motion for Preliminary Injunction and Motion for Temporary Restraining Order (**Doc. 3**) on May 20, 2016, requesting this Court to issue a temporary restraining order halting further releases of wolves by the Service within New Mexico for

fourteen (14) days, pursuant to Federal Rule of Civil Procedure 65, and to set argument with respect to the Department's request for a preliminary injunction prior to the expiration of the temporary restraining order. On May 23, 2016, the Court filed a Notice of Hearing on Petitioner's Motion to be set for May 26, 2016. As the Court noted at the Hearing, given that Respondents had an opportunity to respond to Petitioner's Motion both through written briefs and at oral argument, Petitioner's request for a temporary restraining order instead became a request for a preliminary injunction. Respondents filed a Memorandum in Opposition (**Doc. 9**) on May 24, 2016, and Petitioner filed a Reply (**Doc. 13**) on May 25, 2016. At the May 26, 2016 hearing, the Court heard oral argument from both parties regarding whether or not the Court should grant Petitioner's Motion for Preliminary Injunction.

### LEGAL STANDARD

A preliminary injunction may not be issued unless the movant shows that: (1) the movant has a substantial likelihood of prevailing on the merits; (2) the movant will suffer irreparable injury unless the injunction or restraining order is issued; (3) the threatened injury outweighs the harm the injunction or restraining order might cause the adverse party; and (4) the injunction or restraining order, if issued, would not be adverse to the public interest. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001); *McClendon v. City of Albuquerque*, 272 F. Supp. 2d 1250, 1253 (D.N.M. 2003). A movant is not able to show the existence of an irreparable injury if he has an adequate remedy at law to address the alleged harm. *See Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1353 (10th Cir. 1989). Because a preliminary injunction is an extraordinary remedy, any right to relief must be clear and unequivocal. *See Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coal v.*

*Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)). Whether to grant a preliminary injunction rests within the sound discretion of the trial court. *See United States v. Power Eng'g Co.*, 191 F.3d 1224, 1230 (10th Cir. 1999).

Petitioner must satisfy the "statutory standing" requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, which require establishing that Respondents took "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704; *Colorado Farm Bureau Fed'n v. U.S. Forest Service*, 220 F.3d 1171, 1173 (10th Cir. 2000) (citations omitted). In order to determine if an agency action is final, the court looks to whether the action marks the consummation of the agency's decision-making process, and whether the action is one by which rights or obligations have been determined or from which legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997).

DISCUSSION

## I.       Standing and Judicial Review

Before turning to the merits of whether or not the Court should grant Petitioner's Motion for Preliminary Injunction, the Court first addresses the arguments raised by Respondents regarding whether Petitioner has standing to bring the Motion for Preliminary Injunction and whether this Court may review 43 C.F.R. § 24.4(i)(5)(i).

## A.       Article III Standing

Respondents argue that Petitioner has only vaguely alleged how the 2016 planned wolf releases will disrupt its comprehensive management efforts of wildlife and therefore has failed to show an injury-in-fact that is concrete and particularized as well as actual and imminent. *See Wyo. ex rel. Crank v. United States*, 539 F.3d 1236, 1241 (10th Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Respondents note that Petitioner has not

4

explained how the release of two to six additional wolf pups, and one adult pair with pups, leaves the status quo significantly different as to the impact on ungulate[1] herds. Respondents additionally note that Petitioner briefly mentions that the unregulated release of non-domesticated animals, such as wolves, constitutes a public nuisance. Respondents argue that Petitioner does not have standing as a *parens patriae* to bring an action on behalf of its citizens against the federal government because the federal government is presumed to represent the State's citizens. *See Wyo. ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992).

Petitioner counters that it specifically alleged that Respondents' decision to adopt an *ad hoc* approach to wolf releases impacts Petitioner's ability to actively manage wildlife across the State. Such harms have already occurred and will continue to occur as Respondents release additional wolves into New Mexico. Thus, Petitioner argues that it has sufficiently established injury-in-fact. Petitioner additionally argues that it has standing as a *parens patriae* to bring a nuisance action based upon the distinction between the federal government's "[a]ctivities commanded or authorized by statute," in which public interest is presumed, and those that reflect "an agency's choice of a particular course of action," which may or may not be consistent with the underlying statute. *Michigan v. U.S. Army Corps of Engineers*, 758 F.3d 892, 894 (7th Cir. 2014). The latter may give rise to public nuisance liability. *See id*. Petitioner argues that the Endangered Species Act ("ESA") does not require the release of wolves into New Mexico, but rather, Respondents have chosen that particular course of action, thus giving Petitioner standing as a *parens patriae*.

As the Court ruled orally at the hearing, the Court finds that Petitioner has sufficiently alleged an injury-in-fact that is concrete and particularized as well as actual and imminent, and

---

[1] A hoofed, typically herbivorous quadruped mammal. *See ungulate*, Merriam-Webster Dictionary (11th ed. 2009). Here, the term is largely used to describe elk, deer, and antelope.

5

thus, Petitioner has standing to bring suit. Though not argued at length at the hearing, the Court additionally finds that Petitioner has standing to bring suit as a *parens patriae* given that Respondents' decision to release wolves into New Mexico without a State permit represents an agency's choice of a particular course of action that may or may not be authorized by statute or regulation.

**B.      Final Agency Action**

Respondents next argue that Petitioner has failed to identify a final agency action taken by the Service that is in violation of 43 C.F.R. § 24.4(i)(5)(i).[2] The APA defines agency action as "includ[ing] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The action must "mark the consummation of the agency's decisionmaking process" and also "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Respondents argue that Petitioner challenges only the Service's day-to-day management of the experimental wolf population through the release of individual wolves. Respondents liken their release of wolves to an "operational" activity that is not a "rule, order, license, sanction, relief, or the equivalent denial thereof" within the ambit of the APA, and alternatively, is not a "final disposition" by the agency, but rather, the implementation of a final disposition already made. *See Chemical Weapons Working Group v. U.S. Dep't of the Army*, 111 F.3d 1485, 1495–96 (10th Cir. 1997). Respondents also cite to *Wild Fish Conservancy v. Jewell*, in which the Ninth Circuit found that

---

[2] As previously stated, the regulation at issue states, in relevant part: "(i) Federal agencies of the Department of the Interior shall: (5) Consult with the States and comply with State permit requirements in connection with the activities listed below, except in instances where the Secretary of the Interior determines that such compliance would prevent him from carrying out his statutory responsibilities: (i) In carrying out research programs involving the taking or possession of fish and wildlife or programs involving reintroduction of fish and wildlife." 43 C.F.R. § 24.4(i)(5)(i).

an agency's occasional closure of a gate supplying water to fish passages did not implicate a final agency action as it merely constituted day-to-day operations. *See* 730 F.3d 791, 800–01 (9th Cir. 2013).

In this case, Respondents argue that the final agency action is the Service's issuance of the Revised 10(j) Rule. *See* 80 Fed. Reg. 2512 (Jan. 16, 2015). The Revised 10(j) Rule was published after multiple public comment periods and preparation of an Environmental Impact Statement. The Rule expanded the area that Mexican wolves may occupy, clarified the provisions regulating the take of wolves, and increased the population objective in the population area. The 2016 releases within New Mexico are therefore not the consummation of a separate decision-making process but rather the day-to-day implementation of the Revised 10(j) Rule. Respondents argue that to the degree Petitioner does challenge the Revised 10(j) Rule, this case should be transferred to the U.S. District Court for the District of Arizona which is currently presiding over four lawsuits challenging those actions pursuant to the ESA and the National Environmental Policy Act.

Respondents next address the 2016 Release Plan. Petitioner argues that the Service's publication of the 2016 Release Plan is a final agency action as it reflects the Service's decision to release and translocate Mexican wolves in New Mexico and Arizona. Respondents counter that the 2016 Release Plan simply implements the decision made in the Revised 10(j) Rule. Additionally, the 2016 Release Plan is merely tentative and cannot be characterized as a final decision on where and how many wolves will be released in New Mexico.

Petitioner argues that they have challenged three separate final agency actions: first, the Revised 10(j) Rule, which sets the framework for the reintroduction of the wolf population; second, the October 14, 2015 letter sent to the Department in which the Service noted that they

would no longer comply with New Mexico's permitting requirements; third, the 2016 Release

Plan, which reflects the Service's consummated decision to release wolves in New Mexico in

2016. The Release Plan states that the Executive Committee approved four discrete actions: "(1)

to initial release a pack (male and female with pups) within New Mexico, (2) to cross-foster pups

into a maximum of five packs (a maximum of six pups are authorized in the Arizona portion of

the MWEPA), (3) to translocate a single wolf (M1336) in Arizona or New Mexico, and (4) to

translocate wolves that may be moved for management purposes during 2016 . . . ." (**Doc. 3-9**).

Petitioner argues that such a plan is the clear result of the Service's decisionmaking process and

the releases are actions from which legal consequences will flow as they directly impact the

rights and obligations of the Department insofar as its ability to control, monitor, and manage the

release of wolves in New Mexico.

   In a Notice of Supplemental Authority (**Doc. 17**), filed on June 1, 2016, Petitioner calls to

the Court's attention the decision by the U.S. Supreme Court in *U.S. Army Corps of Engineers v.*

*Hawkes*, 578 U.S. ___ (2016). *Hawkes* concerned the Clean Water Act and the practice of the

U.S. Army Corps of Engineers to issue to individual property owners an "approved jurisdictional

determination" as to whether a particular piece of property contains "the waters of the United

States." 33 U.S.C. §§ 1311(a), 1362(7), (12). In determining whether the Corps' approved

jurisdictional determination is a final agency action reviewable under the APA, the Court found,

and the Corps did not dispute, that the determination satisfied the first condition of *Bennett v.*

*Spear*, namely, that the action marked the consummation of the agency's decisionmaking

process. *See Hawkes* at *5. As to the second *Bennett* condition that the action must be one by

which rights or obligations have been determined, or from which legal consequences flow, the

Court found that both a negative and affirmative jurisdictional determination gave rise to direct

and appreciable legal consequences. *See id*. at *6. A negative jurisdictional determination created a five-year safe harbor limiting potential liability for Clean Water Act violations, while an affirmative jurisdictional determination deprived property owners of the five-year safe harbor that the negative jurisdictional determination afforded. *See id*. at *6–*7. Respondents filed a Response (**Doc. 19**) on June 3, 2016, arguing that the 2016 Release Plan differs from the determination in *Hawkes*, as it merely implements the January 2015 Endangered Species Act Section 10(j) rule for the reintroduced population of wolves, and therefore, is not final agency action.

The Court finds that the 2016 Release Plan constitutes final agency action subject to judicial review, and thus, Petitioner has challenged a final agency action. The 2016 Release Plan "outlines the plan for initial release(s) and translocation(s) of Mexican wolves into the Mexican Wolf Experimental Population Area (MWEPA) in Arizona and New Mexico in 2016" and describes an initial release of a pack of wolves within New Mexico, cross-fostering pups into a maximum of five packs in Arizona, translocation of a single wolf in New Mexico or Arizona, and translocation of wolves for management purposes.

The Court finds that the 2016 Release Plan marks the "consummation of the agency's decisionmaking process," satisfying the first condition of *Bennett v. Spear*. 520 U.S. 154, 178 (1997). The Plan sets forth specific wolf releases to occur in 2016 and is not of a merely tentative or interlocutory nature, as it reflects a settled agency position to release a specific pack of wolves within New Mexico, cross-foster pups in Arizona, and translocate a single wolf. Respondents argue that the 2016 Release Plan simply implements the decision already made in the Revised 10(j) Rule, and further, is tentative in many respects and cannot be characterized as a final decision. However, the Court finds that while the 2016 Release Plan may implement the overall

decision already made in the Revised 10(j) Rule, the 2016 Release Plan addresses specific releases and translocations of specific wolves and packs which are not mentioned in the Revised 10(j) Rule. Thus, while the Revised 10(j) Rule explains and rules upon topics such as the need for additional releases of wolves, zones where cross-fostered pups may be released, and phases in which wolves will be released or translocated, the 2016 Release Plan more accurately details the specific releases for 2016, and thus reflects a settled agency action. While Respondents argue that the 2016 Release Plan is tentative, the Court finds statements such as "[t]his action involves the initial release of a single pair of wolves . . . into a release site in the Gila or Aldo Leopold Wilderness" and "[t]he IFT would hard release M1336 [a particular wolf] onto Federal land inside the MEWPA in Arizona or New Mexico" to indicate that while releases may be contingent upon pack behavior or litter size, the overall plan definitively outlines releases of specific wolves. The Court additionally finds Respondents' argument that Petitioner only challenges the Service's day-to-day management of the experimental population to be unpersuasive. The nine-page 2016 Release Plan, complete with multiple maps, far differs from the occasional closure of a gate supplying water such as in *Wild Fish Conservancy v. Jewell*, 730 F.3d 791 (9th Cir. 2013).

The Court also finds that Petitioner has satisfied the second condition of *Bennett v. Spear*, as the 2016 Release Plan is an action by which rights or obligations have been determined or from which legal consequences will flow. *See* 520 U.S. at 178. By foregoing compliance with the State's permitting requirements, Respondents directly impact the obligations of the Department to monitor, manage, and otherwise regulate New Mexico's comprehensive wildlife management effort.

The Court additionally finds that Petitioner has challenged the Revised 10(j) Rule, as

Petitioner's Complaint asserts that the Rule established a new and different recovery objective in an arbitrary and capricious manner. Petitioner argues that Respondents have subsequently taken steps to implement that new recovery objective through the 2016 Release Plan. As Respondents concede that the Revised 10(j) Rule is final agency action, Petitioner has challenged a second final agency action subject to judicial review under the APA.

**C.      Judicial Review of 43 C.F.R. § 24.4(i)(5)(i)**

Respondents next argue that 43 C.F.R. § 24.4(i)(5)(i) is not reviewable because it is "committed to agency discretion by law," as the broad language lacks any meaningful standard against which to judge the Director's determination that compliance with New Mexico's permit requirements prevents the Service from carrying out the agency's statutory responsibilities. *See* 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Respondents note that cases involving similar statutory or regulatory language have found that judicial review of such determinations is unavailable. *See, e.g.*, *Turner v. Schultz*, 187 F. Supp. 2d 1288, 1296 (D. Colo. 2002) (declining to review a regulation that provided that "[i]t is otherwise determined *by the Department* that it is not in the interest of the United States to provide representation") (emphasis in original).

Petitioner counters that review is inappropriate only "in those rare circumstances where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting *Webster v. Doe*, 486 U.S. 592, 599–600 (1988)). Petitioner argues that 43 C.F.R. § 24.4(i)(5)(i) provides a meaningful standard of review because Respondents are not carrying out a specific statutory directive but rather are acting pursuant to a statutory grant of authority. 16 U.S.C. § 1539(j)(2)(A) states that "[t]he Secretary *may* authorize the release (and the related

11

transportation) of any population . . . of an endangered species or a threatened species outside the current range of such species if the Secretary determines that such release will further the conservation of such species" (emphasis added), while the C.F.R. provision at issue uses the language "[f]ederal agencies of the Department of the Interior *shall* . . . [c]onsult with the States and comply with State permit requirements . . . ." 43 C.F.R. § 24.4(i)(5)(i) (emphasis added). Petitioner thus argues that the standard to be applied is whether compliance with New Mexico's permitting requirements "prevent" Respondents from "carrying out" their mandatory "statutory responsibilities" under the ESA with respect to nonessential experimental populations. 43 C.F.R. § 24.4(i)(5).

The Court finds that 43 C.F.R. § 24.4(i)(5)(i) provides a meaningful standard of review and is not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The regulation provides a clear standard by which to evaluate the Service's compliance. As the regulation states, the Service shall comply with State permit requirements unless the Secretary determines that compliance would prevent him from carrying out his statutory responsibilities. The Secretary's statutory responsibilities are expressly stated in the ESA. Thus, the provisions of the ESA that the Secretary is instructed to carry out provide a meaningful standard against which to review the Service's compliance with 43 C.F.R. § 24.4(i)(5)(i).

Respondents cite to *Turner v. Schultz* in arguing that judicial review of similar statutory language has been found unreviewable. *See* 187 F. Supp. 2d 1288 (D. Colo. 2002). *Turner* involved the review of a regulation that permitted the withdrawal of attorney representation to a federal employee whenever "[i]t is otherwise determined by the Department that it is not in the interest of the United States to provide representation to the employee." 28 C.F.R. § 50.15(b)(2). As the district court noted, short of cross-examining the Attorney General on his views of the

interests of the United States, no basis existed for a court to assess the decision. *See Turner*, 187

F. Supp. 2d at 1296. The Court finds a significant difference between the abstract nature of

reviewing a Department's determination of the "interest[s] of the United States" in *Turner* and

the tangible nature of reviewing the Secretary's statutory responsibilities in this case. The Court

therefore concludes that 43 C.F.R. § 24.4(i)(5)(i) is not committed to agency discretion by law

and may be reviewed.

## II.     Preliminary Injunction

Given that the Court finds that Petitioner has Article III standing, has sufficiently

challenged a final agency action, and that 43 C.F.R. § 24.4(i)(5)(i) provides a meaningful

standard of review, the Court turns to the merits of the preliminary injunction.

In order for the Court to grant Petitioner's Motion for Preliminary Injunction, Petitioner

must show that: (1) Petitioner has a substantial likelihood of prevailing on the merits; (2)

Petitioner will suffer irreparable injury unless the injunction or restraining order is issued; (3) the

threatened injury outweighs the harm the injunction or restraining order might cause the adverse

party; and (4) the injunction, if issued, would not be adverse to the public interest. *See Prairie

Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001). The Court

addresses each of these elements in turn.

The Court notes that the Tenth Circuit has identified three types of particularly disfavored

preliminary injunctions, concluding that a movant must make a heightened showing to

demonstrate entitlement to relief with respect to such injunctions. *See O Centro Espirita

Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004). These three

types are: a preliminary injunction that alters the status quo, a mandatory preliminary injunction,

or a preliminary injunction that affords the movant all the relief that it could recover at the

conclusion of a full trial on the merits. *See id.* A movant seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms. *See id.* at 976. Neither party addressed in their briefs or at oral argument whether or not Petitioner seeks a disfavored preliminary injunction. While the Court therefore finds that an exhaustive determination of whether or not Petitioner seeks a disfavored preliminary injunction is unnecessary, the Court additionally finds that Petitioner has satisfied the heightened burden and made a strong showing both with regard to likelihood of success on the merits and with regard to the balance of harms.

## A.      Likelihood of Success

Petitioner argues that they are likely to succeed on the merits of both their state law and federal law claims. Petitioner argues that the Service violated New Mexico State law requiring all persons who import and release non-domesticated animals to obtain a permit before doing so. Rather than address the concerns of the Department and submit revised applications, Petitioner argues that the Service instead decided to proceed in violation of State law. Petitioner also argues that Department of the Interior regulations require the Service in carrying out "programs involving reintroduction of fish and wildlife" to "consult with the States and comply with State permit requirements . . . except in instances where the Secretary of the Interior determines that such compliance would prevent him from carrying out his statutory responsibility." 43 C.F.R. § 24.4(i)(5)(i). In the Service's October 14, 2015 letter, the Service writes: "The Service . . . applied for the subject permits. At this point, the Service has complied with the Department of the Interior regulations (43 C.F.R. § 24.4(i)(5)(i)) that direct the Service to comply with State permit requirements." Petitioner argues that applying for a permit is not the equivalent of securing a permit.

Petitioner notes that in the same letter, the Service argues that it intended to proceed in violation of State law because complying with State law would prevent the Service from carrying out its statutory responsibilities. However, Petitioner argues that the fact that the State has denied a permit for the release of two wolves in New Mexico does not prevent the Secretary from carrying out his statutory responsibility. Petitioner notes that the statutory language regarding experimental populations is not a specific statutory directive but rather is a statutory grant of authority. 16 U.S.C. § 1539(j)(2)(A) states that the "Secretary *may* authorize the release (and the related transportation) of any population . . . of an endangered species." (emphasis added). By contrast, the language requiring the Service to comply with State permitting processes is mandatory: "Federal agencies of the Department of the Interior *shall*: . . . Consult with the States and comply with State permit requirements . . . ." (emphasis added). Petitioner therefore argues that the denial of two State permits does not prevent the Secretary from carrying out his statutory responsibilities involving the reintroduction of fish and wildlife.

Respondents raise several arguments regarding Petitioner's likelihood of success on the merits of both the state law and federal law claims.

1.       The Service is in Compliance with the Federal Regulation

Respondents argue that Petitioner cannot show a likelihood of success on the federal law claims as Respondents have acted in compliance with 43 C.F.R. § 24.4(i)(5)(i). The Service has determined that reintroduction of wolves is necessary to further the conservation of the species and additional releases in New Mexico and Arizona are critical to improve the genetic make-up of the Mexican wolf population. Therefore, Petitioner's attempted veto through denial of State permits conflicts with the Service's ESA conservation duties and justifies the Service's determination that obtaining the permits "would prevent [the Service] from carrying out [its]

15

statutory responsibilities." 43 C.F.R. § 24.4(i)(5). Respondents also take issue with Petitioner's

suggestion that, without a revised recovery plan, the Director of the Service could not reasonably

determine that the Service's statutory responsibilities included releasing additional wolves.

Respondents argue that the Service is not precluded from taking action to further the recovery of

the wolf until the revised recovery plan is complete, and regardless, such recovery plans are non-

binding.

2.      Petitioner's Denial of Permits Violates the Intergovernmental Immunity Doctrine

        Respondents additionally argue that Petitioner's state law claims violate the

intergovernmental immunity doctrine, which prohibits states from regulating or otherwise

impeding constitutionally-provided activities of the federal government, except to the extent

clearly and specifically authorized by Congress. *See Hancock v. Train*, 426 U.S. 167, 178–81

(1976). Respondents contend that Petitioner's application of New Mexico State law to prohibit

the Service from releasing wolves it has deemed necessary therefore violates the

intergovernmental immunity doctrine.

3.      Application of State Law is Preempted by the ESA

        Similarly, Respondents argue that the New Mexico permit requirements relied upon by

Petitioner are preempted by the ESA, which Congress intended to be far-reaching and afford

endangered species "the highest of priorities." *Tenn. Valley Authority v. Hill*, 437 U.S. 163, 174

(1978). Respondents also argue that Petitioner can claim no reservation of power under the Tenth

Amendment because it is "apparent that the Tenth Amendment does not reserve to the [State] the

right to manage wildlife on [federal land], regardless of the circumstances." *Wyoming v. United

States*, 279 F.3d 1214, 1227 (10th Cir. 2002). Similarly, Respondents conclude that Petitioner

cannot claim that the Service's release of wolves on federal land violates state law requirements.

4.      The Court's Finding

The Court finds that Petitioner has shown a substantial likelihood of prevailing on the merits. First, under a plain reading of 43 C.F.R. § 24.4(i)(5), Respondents must comply with State permit requirements except in instances where the Secretary determines that such compliance would prevent him from carrying out his statutory duties. While Respondents have previously indicated that they may comply with State permit requirements by simply applying for a State permit, even if it is denied, the Court does not credit this argument and finds that the clear meaning of compliance with State permit requirements requires actually receiving a permit and not merely applying for one.

The crux of Respondents' argument is that New Mexico's denial of two permits to release wolves in New Mexico prevents the Secretary from carrying out his statutory duties, and thus they may decline to comply with the State permitting process. Examining the statutory language regarding experimental populations, the language states that "[t]he Secretary *may* authorize the release (and related transportation) of any population . . . of an endangered species or a threatened species outside the current range of such species if the Secretary determines that such release will further the conversation of such species." 16 U.S.C. § 1539(j)(2)(A) (emphasis added). The Court finds a significant difference between a statutory grant of authority, such as stating that the Secretary *may* take an action, and a specific statutory directive requiring the Secretary to take an action. The Court reads 16 U.S.C. § 1539(j)(2)(A) to permit, or allow, the Secretary to authorize the release of a threatened or endangered species, but not to require, or obligate, the Secretary do so. The Court thus finds that the permissive language contained in the statute does not constitute a statutory responsibility of the Secretary. Therefore, compliance with State permit requirements and 43 C.F.R. § 24.4(i)(5)(i) does not prevent the Secretary from

carrying out his statutory responsibilities within the context of the ESA. Respondents argue at length regarding the importance of the reintroduction of the Mexican wolf population. However, it is Respondents' own regulation that places the burden on them to comply with State permit requirements.

Similarly, Respondents argue that New Mexico's permit requirements are preempted by the ESA and Petitioner can claim no reservation of power under the Tenth Amendment, citing to *Wyoming v. United States*, 279 F.3d 1214 (10th Cir. 2002). In *Wyoming*, the State sued on the basis of impingement on state sovereignty and Tenth Amendment infringement. *See id*. at 1223. While Petitioner has raised state law claims regarding state sovereignty, Petitioner has additionally raised federal law claims, which the Court finds compelling. Unlike in *Wyoming*, based entirely on powers reserved to the state, it is Respondents' own federal regulation that curtails their power and requires them to release wolves in compliance with State permit requirements.

Respondents arguments concerning the intergovernmental immunity doctrine fare no better. Respondents cite to *Hancock v. Train*, 426 U.S. 167 (1976) for the proposition that even where the Clean Air Act obligated federal installations to comply with certain State air pollution requirements, a State may not forbid a federal facility from operating without a State permit on the basis of the intergovernmental immunity doctrine. *See id*. at 180. However, the Court reads *Hancock* to represent a more limited holding. The Supreme Court read the relevant provision of the Clean Air Act to mean that "Congress has fashioned a compromise which, while requiring federal installations to abate their pollution . . . under standards which the States have prescribed, stopped short of subjecting federal installations to state control." *Id.* at 198–199. Thus, while the federal installations were to abate their pollution under State standards, the EPA, not the State,

maintained the authority to ensure conformity with the standards. By contrast, in this case, 43

C.F.R. § 24.4(i)(5) makes clear that the regulation requires federal agencies to "comply with

State permit requirements," which necessarily subjects the Service to New Mexico's permit

process. Therefore, the Court finds that Petitioner's denial of permits does not violate the

intergovernmental immunity doctrine.

**B.      Irreparable Injury**

To satisfy the irreparable injury requirement, Petitioner must show "a significant risk that

he or she will experience harm that cannot be compensated after the fact by monetary damages."

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (citation omitted). The

standard requires that the injury be "both certain and great," not "merely serious or substantial."

*Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008). Furthermore,

Petitioner must demonstrate that the harm "is likely to occur before the district court rules on the

merits." *RoDa Drilling Co.*, 552 F.3d at 1210 (citation omitted).

Petitioner argues that the injury is imminent because the Service has already released

captive-bred wolves in the State and plans to continue to do so. Petitioner further argues that the

Service's introduction of an apex predator in numbers, at locations, and at times not known to the

Department will cause irreparable harm by disrupting the State's comprehensive management

effort of wildlife in New Mexico. Further, once released, there exist practical and legal obstacles

in tracking and recapturing the wolves using non-lethal means.

Respondents argue that Petitioner cannot show that the introduction of two to six cross-

fostered pups, the release of one pack, and the possible translocations are likely to result in a

concrete and actual injury to its interests in managing wild ungulate herds. Additionally,

Respondents note that Petitioner's argument that each single wolf release infringes on the State's

sovereign interests can be rejected given the supremacy of the ESA. Further, Respondents argue that if Petitioner truly believed that it would suffer imminent irreparable harm from the release of additional wolves in New Mexico, it could have filed suit as early as January 2015 after issuance of the Revised 10(j) Rule. Respondents conclude that Petitioner's own delay militates against a finding of irreparable harm.

The Court finds that Petitioner has sufficiently alleged a significant risk of harm likely to occur before the district court rules on the merits. The key factor is whether the imminent injury will not be able to be compensated after the fact by monetary damages. *Compare RoDa Drilling Co.*, 552 F.3d at 1210 (finding that deprivation of control of real property constituted irreparable harm) *with Morton v. Beyer*, 822 F.2d 364, 371 (3d Cir. 1987) (finding that a loss of income was purely economic in nature and thus compensable in monetary damages). In this case, the release of wolves in violation of the State permitting process, which has already occurred, cannot be compensated after the fact by monetary damages. Similarly, disruption to the State's comprehensive wildlife management effort cannot be remedied through monetary compensation.

Respondents argue that the number of wolves planned for release will not have a significant impact on the State's management of wild ungulate herds, and thus, Petitioner cannot show an irreparable injury. However, the Court finds that Petitioner has sufficiently shown a significant risk that the release of an apex predator, without Petitioner's knowledge of the time, location, or number of releases, presents a serious enough risk of harm to the State's comprehensive wildlife management effort to satisfy the irreparable injury requirement. Finally, the Court finds that Petitioner did not unnecessarily delay filing this Motion for Preliminary Injunction. Rather, it appears that Petitioner filed a 60-day notice of suit letter several months after receiving Respondents' letter stating that they intended to release wolves in New Mexico

without following the State's permitting process.

**C.    Balance of Equities**

Petitioner argues that the balance of equities weighs in favor of issuance of the preliminary injunction. Whereas a relatively short-term delay in the release of captive wolves will result in little harm to Respondents, release of wolves in violation of the State permitting process will result in irreparable injury. Petitioner further argues that the captive-bred wolves are designated as a "nonessential experimental population" which by definition is not essential to the continued existence of the species. *See* 80 Fed. Reg. 2512 (Jan. 16, 2015).

Respondents argue that Petitioner's request to enjoin actions necessary for the conservation of the Mexican wolf is contrary to the high priority that Congress has placed on the protection and recovery of endangered species. Without continued releases, the genetic health of the Mexican wolf population in the wild will stagnate and possibly deteriorate. Because Congress has tipped the equities heavily by affording the protection of endangered species the highest of priorities, the balance weighs in Respondents' favor.

The Court finds that the balance of equities weighs in favor of issuance of the preliminary injunction. Respondents make much of the high priority Congress has placed on the protection of endangered species. However, issuance of the preliminary injunction, while disrupting Respondents' plans to release wolves in violation of the State permitting process, does not necessarily prevent continued releases or any alteration to Respondents' release of wolves. Respondents must simply comply with their own federal regulation and comply with State permitting requirements before they import and release wolves in New Mexico.

**D.    Public Interest**

Petitioner argues that departure from the Service's precedent to secure Department

approval before releasing captive-bred wolves in New Mexico threatens the Department's duty to fulfill its obligation to the citizens of New Mexico to comprehensively manage wildlife. Petitioner argues that wolves must be closely managed due to the predator-prey dynamics that have the potential for ripple effects within ecosystems. Additionally, Petitioner argues that wolves have the potential to amount to a public nuisance, and the power to abate a public nuisance through equity is well established.

Respondents conclude that the public interest in conserving the Mexican wolf weighs against injunctive relief given the importance of the protection of endangered species and the fragile genetic health of the current Mexican wolf population.

The Court finds that issuance of the injunction would not be adverse to the public interest. As stated earlier, issuance of the injunction will not necessarily result in the Service from being precluded from any further wolf releases. By seeking and receiving a State permit for releases, which Respondents previously have done, Respondents will comply with federal regulations governing the reintroduction of wildlife, and, upon State approval, continue to release wolves.

## CONCLUSION

Accordingly, the Court finds that Petitioner has established each of the required factors necessary to obtain a Preliminary Injunction and that in addition, Petitioner is entitled to requested declaratory relief.

In Petitioner's Complaint for Declaratory Judgment and Injunctive Relief (**Doc. 1**), filed May 20, 2016, Petitioner's Prayer for Relief seeks declaratory relief. The Court grants Petitioner's request and finds and declares as follows:

- That Defendants have violated State law by failing to obtain the requisite importation and release permits from the Department prior to importing and releasing Mexican wolves into the State;

- That Defendants cannot import or release any Mexican wolves into the State without first obtaining the requisite importation and release permits from the Department;

- That Defendants have violated State law by importing and releasing Mexican wolf offspring in violation of prior Department permits;

- That Defendants cannot import and release any Mexican wolf offspring in violation of prior Department permits;

- That Defendants have violated the APA by failing to comply with State permit requirements.

The Court finds that Petitioner is entitled to a preliminary injunction in which Respondents are enjoined from important or releasing any Mexican wolves into the State without first obtaining the requisite importation and release permits from the Department, and are enjoined from importing and releasing any Mexican wolf offspring in violation of prior Department permits. However, Petitioner seeks additional injunctive relief that the Court declines to grant.

First, Petitioner seeks an injunction requiring Respondents to capture and remove from the State any and all Mexican wolves that were imported and/or released in violation of State law. The Court has determined that including within the Preliminary Injunction a requirement that Respondents find, capture, and remove the two cross-fostered pups allegedly released around April 23, 2016 would alter Petitioner's ability to show that an injunction should be issued. First, removal of the wolves released in violation of State law would reduce Petitioner's showing of irreparable injury. Petitioner's argument that introduction of the wolves in unknown numbers, times, and locations will cause irreparable harm to the State's comprehensive management plan is diminished if the wolves released in violation of the State permitting process

23

are removed. Additionally, requiring Respondents to find, capture, and remove the April 23, 2016 released wolves will shift the balance of equities to favor Respondents. Accordingly, the injunction shall apply only to the Service's proposed future release of wolves.

Second, Petitioner seeks three types of relief[3] that were not raised or addressed in Petitioner's Motion for Preliminary Injunction, subsequent briefing, or at oral argument. Therefore, the Court will not grant relief for these requests.


**SO ORDERED**


_____
UNITED STATES DISTRICT JUDGE

---

[3] *See* **Doc. 1**, at 13. "9. Adjudge and declare that Defendants have violated the APA by finalizing and implementing the *Initial Release and Translocation Plan for 2016*; 10. Order the Service to vacate the *Initial Release and Translocation Plan for 2016*; 11. Issue an injunction enjoining the Service from issuing an experimental population rule that is inconsistent with the operative recovery plan for the Mexican wolf."